# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA

UNITED STATES OF AMERICA ex rel.
ALEXANDRA ARSHED,

    Plaintiff,

v.

OFFICE DEPOT, INC.,

    Defendant.

Case No. 18-23417

CIV-COOKE

COMPLAINT, FILED UNDER SEAL

JURY TRIAL DEMANDED



FILED by JAO D.C.

AUG 23 2018

STEVEN M. LARIMORE
CLERK U.S. DIST. CT.
S.D. of FLA. - MIAMI

/GOODMAN

## INTRODUCTION

1. In 2005 to 2006, Office Depot and now-subsidiary OfficeMax settled a lawsuit under the False Claims Act for $4.75 million and $9.8 million, respectively, for selling office products to the federal government that were made in countries not permitted by the Trade Agreements Act of 1979 ("TAA"). The TAA does not allow the sale of goods from certain countries, such as Iran, to the federal government.

2. In 2016, Relator Alexandra Arshed—a senior auditor at Office Depot—("Relator or "Ms. Arshed") discovered information leading her to believe that Office Depot was still selling items to the U.S. government that came from TAA non-compliant countries.

3. When Relator raised this issue with her supervisor, she was ultimately terminated.

4. Relator now brings this suit against Office Depot on behalf of the government, to recover funds from false or fraudulent claims for items that Office Depot certified were compliant with the TAA, but were not, or for items Office Depot certified as compliant with the TAA but had no idea if they were compliant.

## PARTIES

5. Ms. Arshed is a resident of Boca Raton, Florida. Until July 17, 2017, she was employed as a Senior Auditor at Office Depot.

6. Office Depot, Inc. ("Office Depot") is a corporation organized under the laws of Delaware and headquartered in Boca Raton, Florida.

## JURISDICTION AND VENUE

7. This Court has subject matter jurisdiction over this dispute under 28 U.S.C. § 1331 (Federal question), 28 U.S.C. § 1345 (United States as plaintiff), and 31 U.S.C. § 3732(a) (False claims jurisdiction).

8. This Court has personal jurisdiction over Office Depot because the company resides in Florida, transacts business from Florida, and a substantial number of the transactions at issue in this case emanated from Florida.

9. Venue is proper in the Southern District of Florida because Office Depot resides in this venue and transacts business from it.

10. No jurisdictional bar applies that would preclude the relator's claims under the False Claims Act.

11. This action is not based upon the prior public disclosure of allegations or transactions in a federal or state criminal, civil, or administrative hearing in which the Government or its agent is a party; in a congressional, Government Accountability Office, or other Federal or state report, hearing, audit, or investigation; in the news media; or in any other form as the term "publicly disclosed" is defined in either the FCA or the Florida FCA.

12. To the extent there has been a public disclosure unknown to Relator, she is an original source within the meaning of 31 U.S.C. § 3730(e)(4).

13. Pursuant to 31 U.S.C. § 3730(b)(2) Relators have prepared and served on the Attorney General of the United States and the United States Attorney for the Southern District of Florida, a written disclosure of all material evidence and information currently in their possession. The written disclosure is supported by material evidence known to Relators at the time of filing this Complaint establishing the existence of Office Depot's fraudulent conduct, which resulted in economic loss to the United States. That information includes attorney-client communications and work product of Relators' attorneys, and was submitted to those federal officials in their capacity as potential co-counsel in this action.

## LEGAL BACKGROUND

14. In 2003, Office Depot faced its first lawsuit accusing it of violating the Trade Agreements Act ("TAA").[1]

15. The TAA arose from a global movement away from protectionism. During the Great Depression, stagnating financial conditions had stoked resentment towards foreign-made

---

[1] See *United States ex rel. Safina Office Products v. Office Depot et al.*, No. 1:03-cv-00003, Dkt. 1 (D.D.C. Jan. 2, 2003).

products. This sentiment spurred countries to enact trade barriers to force their citizens to buy domestic. During this time, Congress passed the Buy American Act, requiring federal agencies to purchase only American-made products.[2]

16. World War II marked the end of this protectionist era. Free trade became the new international norm. To align with the times, Congress passed the TAA, effectively repealing the Buy American Act. The TAA allowed federal agencies to purchase products from not only the United States, but also certain "designated countries." Countries could become "designated" by entering a free trade agreement with the United States or by signing a treaty with the World Trade Organization.[3]

17. Today, most nations have secured a place on the list of "designated" countries. Some countries, however, are conspicuously absent, such as Russia, China, and Iran. Federal agencies are forbidden from purchasing products that originate in these countries.

18. To sell to the government, contractors must enter an agreement with the General Services Administration ("GSA"), the government's chief sourcing agency. To facilitate agencies' compliance with the TAA, the GSA requires all government contractors to certify that their goods originate in permissible countries. That way, government buyers do not have to independently verify that each item comes from a "designated" country or the United States. They can rely on the contractors' certification.

19. Contractors are subject to the GSA's "Multiple Award Schedules," a set of open-ended contracts, under which contractors agree to supply certain products to any federal agency that orders them. Each order incorporates the terms of the Award Schedules, which require contractors to comply with particular federal regulations, including the TAA.[4] Award Schedules can be very lucrative for contractors.

---

[2] Unless American-made products were unavailable.

[3] Caribbean and least developed countries are exempt from this requirement.

[4] For example, Office Depot's Schedule 75 contract (executed Oct. 4, 2010) states, "The Contractor shall deliver under this contract only U.S.-made or designated country end products."

4

20. Additionally, the Federal Acquisition Regulation requires contractors to certify that each shipment of their products to a federal purchaser conforms to the mandates of the TAA.[5] Contractors that *falsely* certify compliance may face liability under the False Claims Act.

21. Congress passed the False Claims Act at the height of the Civil War, when war profiteering was commonplace. Unscrupulous contractors offloaded sick horses, lame mules, faulty munitions, and spoiled food on the United States Army. To combat this rampant fraud, Congress implemented legislation to hold contractors criminally and civilly liable for submitting a false or fraudulent claim to the U.S. government.

22. Under the False Claims Act, only the Department of Justice (DOJ) may bring a criminal case. For civil cases, however, the Act permits either the DOJ or a private citizen to institute a lawsuit. In order to file, private citizens must have original or non-public information about a violation of the False Claims Act. These private citizens are often company employees who face serious risk in filing a false claims action. The False Claims Act, however, provides them an incentive to come forward: if the suit is successful, they can share in the recovery. The bulk of the funds, however, go back into the federal coffers.

23. In just the last decade, whistleblowers have helped the U.S. government recover over $30 billion in federal funds.[6]

## FACTUAL ALLEGATIONS

24. Office Depot received its first Multiple Award Schedule contract in 2000. Within three years, a whistleblower had filed a false claims action against Office Depot, alleging

---

[5] 48 C.F.R. §§ 52.225-5, 52.225-6.

[6] Dep't of Justice, *Justice Department Recovers Over $4.7 Billion From False Claims Act Cases in Fiscal Year 2016* (Dec. 14, 2016), https://www.justice.gov/opa/pr/justice-department-recovers-over-47-billion-false-claims-act-cases-fiscal-year-2016.

numerous violations of TAA. The complaint alleged a handful of TAA non-compliant items that Office Depot was selling to federal agencies, such as Chinese pushpins.[7]

25. The United States elected to intervene in the lawsuit in late 2005, and OfficeMax and Office Depot promptly settled. Collectively, Office Depot and its now-subsidiary agreed to pay $14.55 million to the U.S. government.

26. Office Depot acquired OfficeMax in 2013, placing it under Office Depot's corporate umbrella.

27. Relator began working at Office Depot in 2014. She was hired to help combine Office Depot's and OfficeMax's accounting departments after the merger. Upon completing this project, Relator stayed on at Office Depot and was tasked with auditing several aspects of the companies' policies and practices.

28. In 2016, Relator worked on an audit, during which she discovered information that led her to believe that Office Depot was still selling a substantial number of TAA non-compliant items to the U.S. government.

29. Relator raised her concern to Office Depot that the company might be submitting false claims to the U.S. government. Relator requested that Office Depot identify all known violations and voluntarily report them to the U.S. government.[8]

30. After hearing this, Relator's supervisor told her to stop inquiring into the matter. The supervisor said that the non-compliance was "not a big deal," and that Relator was "stupid" for making it a big deal.

---

[7] *United States ex rel. Safina Office Products v. Office Depot et al.*, No. 1:03-cv-00003, Dkt. 1 at 10 (D.D.C. Jan. 2, 2003).

[8] Relator's request is in line with mandatory reporting requirements. The Federal Acquisition Regulation requires that a company that contracts with or sells to the U.S. government that discovers "credible evidence" that it committed a "[v]iolation of the civil False Claims Act" must "timely disclose" the violation "to the Government." FAR 9.406-2(b)(1)(iv)(B).

31. When Relator refused to relent, her supervisor said she was going to write a negative performance review to "justify firing" Relator.

32. Relator's supervisor made good on this promise. Relator received a letter terminating her employment on July 17, 2017.

## COUNT I

### Violation of the False Claims Act (31 U.S.C. § 3729)

33. The foregoing allegations are incorporated as if fully set forth herein.

34. Through the above-described conduct, Office Depot knowingly presented or caused to be presented to the United States Government false or fraudulent claims for payment.

35. Office Depot knew or should have known that a substantial number of the items it sold to the U.S. government originated in countries that were not permissible under the TAA.

36. Office Depot was deliberately ignorant or recklessly disregarded the truth of its assertions that each of its products was TAA compliance—*e.g.* by deliberately *not* evaluating the TAA compliance of its full inventory, or ignoring evidence that its vendors were misreporting items' country of origin.

37. For each order by a government customer, Office Depot submitted a separate claim for payment--*e.g.*, per the terms of Federal Acquisition Regulation § 52.212-4(g) (for each order, "[t]he Contractor shall submit an original invoice").

38. For each order by a government customer, Office Depot certified that each of its products was made in a TAA compliant country--*e.g.*, per the terms of Federal Acquisition Regulation § 52.225-6 (the contractor "certifies that each end product … is a U.S.-made or designated country end product").

39. These certifications were false. Office Depot's records showed that many of these items originated in non-compliant countries.

40. These certifications were fraudulent. Office Depot had no reasonable basis for certifying compliance for items where country of origin was unknown or based on outdated information.

7

41. Due to the strictures of the TAA, the U.S. government would not have bought these products had it known of their non-compliance, or that Office Depot lacked a reasonable basis to assert their compliance.

42. By paying for these products, the United States has been damaged and continues to be damaged.

## PRAYER FOR RELIEF

Relator Alexandra Arshed requests that a judgment be entered against Office Depot, ordering that:

43. Office Depot ceases and desists from violating the False Claims Act, 31 U.S.C. §§ 3729-33;

44. For violations occurring prior to November 1, 2015, Defendants pay not less than $5,500 and not more than $11,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. § 2461; Public Law 104-410), for each false claim submitted, plus three times the amount of damages the United States has sustained because of their actions;

45. For violations occurring after November 2, 2015, Defendants pay not less than $11,181 and not more than $22,363, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. § 2461; Public Law 104-410), for each false claim submitted, plus three times the amount of damages the United States has sustained because of their actions;

46. Relator be awarded the maximum "relator's share" allowed pursuant to 31 U.S.C. § 3730(d);

47. Relator be awarded all costs of this action, including attorneys' fees and expenses pursuant to 31 U.S.C. § 3730(d);

48. Defendants be enjoined from concealing, removing, encumbering, or disposing of assets which may be required to pay the damages, penalties, fines, attorneys' fees and costs awarded by the Court; and

49. The United States and Relator are awarded such other relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38, Plaintiff demands a trial by jury.

Dated: August 23, 2018

Respectfully submitted,

By: _____
Jonathan Kroner
FBN 328677
**JONATHAN KRONER LAW OFFICE**
300 S. Biscayne Blvd., Suite 3710
Miami, Florida 33131
Telephone: (305) 310-6046
jk@FloridaFalseClaim.com

**GIBBS LAW GROUP LLP**
Eric H. Gibbs
Dylan Hughes
Amy Zeman
Aaron Blumenthal
505 14th Street, Suite 1110
Oakland, CA 94612
Telephone: (510) 350-9700
ehg@classlawgroup.com
dsh@classlawgroup.com
amz@classlawgroup.com
ab@classlawgroup.com

**MILBERG TADLER PHILLIPS GROSSMAN LLP**
Anna C. Dover
1 Pennsylvania Plaza, Suite 1920
New York, NY 10119
Telephone (212) 594-5300
adover@milberg.com